**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DISTRICT OF COLUMBIA**
**INTERNATIONAL CHARTER SCHOOL**,

     *Plaintiff,*

**v.**

**ANA LEMUS,**

     *Defendant.*

**Case No. 21-cv-0223 (RCL)**

---

### MEMORANDUM OPINION

Orlin Cruz Lemus ("Orlin"), a student with a disability, enrolled in the District of Columbia International Charter School ("DCI") in the sixth grade. Nearly three years later, Orlin's mathematics, reading, and written expression skills had either stayed the same or worsened. After DCI expelled Orlin for disciplinary reasons, his mother, Ana Lemus ("Lemus"), administratively appealed to the Office of the State Superintendent of Education seeking, among other things, a determination that DCI denied Orlin a free appropriate public education. After the Office determined that DCI indeed failed to provide an appropriate education, DCI appealed the administrative determination to this Court, seeking declaratory and injunctive relief. Both DCI and Lemus moved for summary judgment. For the reasons that follow, the Court will **GRANT IN PART AND DENY IN PART** DCI's motion for summary judgment, **GRANT IN PART AND DENY IN PART** Lemus's motion for summary judgment, and **VACATE IN PART** the administrative determination, and **REMAND** the case to the Office of the State Superintendent of Education for further proceedings.

# I.     STATUTORY BACKGROUND

## A.  Individuals with Disabilities Education Act ("IDEA")[1]

"Under the Individuals with Disabilities Education Act (known as 'IDEA'), states and territories, including the District of Columbia, that receive federal educational assistance must establish 'policies and procedures to ensure,' among other things, that 'free appropriate public education,' or 'FAPE,' is available to disabled children." *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005) (quoting 20 U.S.C. § 1412(a)(1)(A)). Under the IDEA, school districts "must ensure that '[a]ll children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated.'" *Id.* at 518–19 (quoting 20 U.S.C. § 1412(a)(3)(A)).

When a child with a disability is identified, an Individualized Education Program Team ("IEP Team")—a multidisciplinary group including the child's teachers and parents—creates an Individualized Education Program ("IEP") to provide "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 519 (quoting *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 203 (1982)); 20 U.S.C. §§ 1412(a)(4), 1414(d). An IEP "sets out, in writing, the student's existing levels of academic and functional performance, establishes appropriate goals, and describes how the student's progress toward those goals will be measured." *Z.B. v. Dist. of Columbia*, 888 F.3d 515, 519 (D.C. Cir. 2018) (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(III)).

---

[1] Congress revised the IDEA through the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA") and the IDEIA is now the governing statute. *Brooks v. Dist. of Columbia*, 841 F. Supp. 2d 253, 254 & n.1 (D.D.C. 2012). That said, courts use the terms IDEA and IDEIA interchangeably when discussing provisions present in both statutes. *Phillips ex rel. T.P. v. Dist. of Columbia*, 736 F. Supp. 2d 240, 245 n.3 (D.D.C. 2010). Here, the Court will use the more common "IDEA," as the IDEIA did not modify the statutory provisions relevant here.

Similarly, any proposed change to a student's IEP must be provided to the student's parent in writing. *Middleton v. Dist. of Columbia*, 312 F. Supp. 3d 113, 130 (D.D.C. 2018) (citing 20 U.S.C. § 1414; 34 C.F.R. §§ 300.116(a), 300.327, 300.501(b), 300.503(a)).

## B. Standards for Appropriate IEP Development

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). At a minimum, "[t]he IEP must aim to enable the child to make progress." *Id.* Although the Supreme Court has declined to define the specific contours of "progress," the Court has emphasized that "this standard is markedly more demanding than the 'merely more than *de minimis*' test" applied by some lower courts. *Id.* at 402. According to the Court, "a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all." *Id.* at 402–03. This is because "[f]or children with disabilities, receiving instruction that aims so low would be tantamount to 'sitting idly . . . awaiting the time when they were old enough to drop out.'" *Id.* at 403 (quoting *Rowley*, 458 U.S. at 179).

"The key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to enable the specific student's progress." *Z.B.*, 888 F.3d at 524 (citing *Endrew F.*, 580 U.S. at 400). "[T]hat standard calls for evaluating an IEP as of the time each IEP was created rather than with the benefit of hindsight." *Id.* (internal quotation marks omitted). While a court reviewing an IEP's adequacy "must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as *ideal*," *id.* at 528 (citing *Endrew F.*, 580

U.S. at 399) (emphases in original), a school fails its obligations under the IDEA when the student is unable to achieve progress. *Endrew F.*, 580 U.S. at 398.

### C. IDEA Due Process Hearing and Judicial Review

If a parent of a child with a disability disagrees with the school over "what a child's IEP should contain," the IDEA provides a right to appeal to "an impartial due process hearing," 20 U.S.C. § 1415(f), and a "right to be accompanied and advised by counsel" during such hearing. *Id.* § 1415(h)(1). A qualified impartial hearing officer presides over the due process hearing in accordance with the Act. *Id.* § 1415(f)(3). In the District of Columbia, "the party who filed for the due process hearing shall bear the burden of production and the burden of persuasion" at that hearing. D.C. Code Ann. § 38–2571.03(6)(A) (West 2015). When the dispute involves "the appropriateness of the child's individual educational program or placement," and the parent "establish[es] a prima facie case" that such IEP or placement is inappropriate, then "the public agency shall hold the burden of persuasion." *Id.* After the hearing, the hearing officer issues a hearing officer determination. 20 U.S.C. § 1415(f)(1)(E). When a hearing officer concludes that a student has been denied a FAPE, the hearing officer has "broad discretion to fashion an appropriate remedy, which can go beyond prospectively providing a FAPE, and can include compensatory education." *B.D. v. Dist. of Columbia*, 817 F.3d 792, 797–98 (D.C. Cir. 2016) (internal quotation marks omitted and citation omitted); 20 U.S.C. § 1415(i)(2)(C)(iii).

Either the school or the parent may appeal the hearing officer's determination through a civil action brought in either state or federal court. *Id.* § 1415(i)(2)(A). The reviewing court has jurisdiction to receive the record of the administrative proceeding, to hear additional evidence at

the request of a party, and "basing its decision on the preponderance of the evidence, [to] grant

such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C).

## II.    FACTUAL BACKGROUND

As the parties are aware, this District has supplemented Federal Rule of Civil Procedure

56 with Local Civil Rule 7(h). In general, each party moving for summary judgment must submit

"a statement of material facts as to which the moving party contends there is no genuine issue,"

and each party must submit with their opposition "a statement of genuine issues setting forth all

material facts as to which it is contended there exists a genuine issue necessary to be litigated."

Local Civil Rule 7(h)(1). After these submissions, the Court "may assume that facts identified by

the moving party in its statement of material facts are admitted, unless such a fact is controverted

in the statement of genuine issues filed in opposition to the motion." *Id.* However, when "judicial

review is based solely on the administrative record," as here, "Paragraph (1) shall not apply." Local

Civil Rule 7(h)(2). Instead, "[i]n such cases, motions for summary judgment and oppositions

thereto shall include a statement of facts with references to the administrative record." *Id.* Taken

together, the Court interprets this District's summary judgment rules in an administrative record

case to mean that so-called "factual assertions" that are unsupported by citations to accurate

evidence in the administrative record are insufficient to create issues of material fact. Similarly,

statements of facts with accurate citations that are uncontroverted by an opposing party's

opposition are considered material facts to which there is no genuine issue.

Here, both parties filed statements of facts.[2] *See* Pl.'s Statement of Facts ("PSOF"), ECF

No. 29-1, at 2–8; Def.'s Statement of Facts ("DSOF"), ECF No. 30, at 3–14; Pl.'s Statement of

Facts in Opp'n ("PSOF Opp'n"), ECF No. 32-1. However, Lemus's counsel's statement generally

---

[2] Lemus's counsel did not file a statement of facts with her opposition.

lacks citations to the administrative record ("AR"), ECF No. 28, save for a scarce few facts mostly irrelevant to the motions before the Court.[3] Lemus counsel's reply, ECF No. 48, on the other hand, includes some factual information relevant for the motions before the Court. But Local Civil Rule 7(h)(2) mandates that "*motions for summary judgment and oppositions thereto* shall include a statement of facts with references to the administrative record." (emphasis added). The plain text of the rule does not permit parties to identify undisputed issues of material fact for the first time in a reply.[4] Therefore, the Court will only consider the statements of facts submitted by the parties accompanying their motions for summary judgment, and DCI's opposition, but will not consider any new factual material contained in Lemus's reply.[5] Finally, the Court cites directly to the record when necessary to address facts not raised by the parties, but that the Court concludes must be considered to properly resolve the present case.

### A.  Orlin's Background and Original IEP (May 11, 2017)

Lemus is a resident of the District of Columbia and mother of Orlin.[6] AR at 863–64. Orlin is a resident of the District of Columbia and qualifies as a "child with a disability" under the IDEA. AR at 1658, 1670. Lemus and Orlin were both born in Honduras and are both native Spanish

---

[3] Lemus attempted to correct these errors by filing a "Errata in Statement of Material Facts" five days after the deadline for summary judgment motions. ECF No. 31. This "Errata" added a few, but not all, missing citations to the administrative record as well as changed, added or deleted phrases and sentences. *See id.* Put simply, "[t]he 'Errata' filed by [Lemus] goes well beyond correcting clerical errors." Pl.'s Mem. in Opp'n to Def.'s Mot. for S.J. ("Pl.'s Opp'n"), ECF No. 32, at 2. Because "errata sheets are typically—and, perhaps, appropriately—used only to correct inconsequential errors," and Lemus's "Errata" reaches far past this line, this Court will exercise its "substantial discretion" not to consider the filing. *See Partridge v. Am. Hosp. Manag. Co., LLC*, 289 F. Supp. 3d 1, 11 (D.D.C. 2017).

[4] This is because judges "are not like pigs, hunting for truffles buried in [the administrative record]." *See Potter v. Dist. of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) (internal citation omitted).

[5] Similarly, the Court will not consider any new arguments advanced by Lemus for the first time in the reply brief. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008). These arguments include, among others: the applicability of the IDEA's "mainstreaming" requirement, Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments Act of 1972, the Rehabilitation Act of 1973, the Equal Education Opportunities Act of 1974, and the Americans with Disabilities Act of 1990. *See, e.g.*, Def.'s Reply at 5–9.

[6] The parties' filings and this Court's previous opinion referred to Orlin, who was a minor at time, by his initials "O.C.L." *See Dist. of Columbia Int'l Charter Sch. v. Lemus*, No. 21-cv-0223 (RCL), 2022 WL 873549 (D.D.C. Mar. 24, 2022); Fed. R. Civ. P. 5.2. However, Orlin is now over eighteen years old. Aff. of Orlin Cruz Lemus, ECF No. 45-1, at 2. Thus, the Court will refer to him by his given name.

speakers. DSOF ¶ 1; PSOF Opp'n ¶ 1; AR at 851. Lemus has a limited understanding of English. AR at 851. Lemus came to the United States in 2005, leaving Orlin and his two older sisters in Honduras under the care of Orlin's grandparents. AR at 890. While in Honduras, Orlin sustained three serious head injuries between the ages of approximately five and seven years old. AR at 852.

In 2013, when Orlin was approximately nine years old, he and his sisters migrated to the United States and joined their parents in the District of Columbia. *Id.* That same year he enrolled in Tubman Elementary School ("Tubman"). DSOF ¶ 1; PSOF Opp'n ¶ 1.

In May 2017, when Orlin was in the fifth grade at Tubman Elementary School ("Tubman"), he was given his first comprehensive psychological evaluation. AR at 1657–58. A psychologist reviewed Orlin's educational record, performed a variety of tests, conducted bilingual interviews with Orlin and Lemus, and observed Orlin in class to prepare the evaluation. DSOF ¶ 5; PSOF Opp'n ¶ 5; AR at 1658. The evaluation observed that Orlin possessed reading, mathematics, and written language skills below that of his peers. AR at 851. Specifically, his reading and writing skills were at an approximately second-grade level, and his mathematics skills were at an approximately third-grade level. AR at 857–58. The evaluation concluded that Orlin was "eligible for special education as a student with an Intellectual Disability." AR at 861.

Tubman issued Orlin's first IEP on May 11, 2017. PSOF at 2; AR at 1084–97. The IEP noted Orlin's disability classification as "Intellectual Disability (also known as Mental Retardation)." AR at 1084. The IEP further described Orlin's then-present levels of academic achievement in mathematics, reading, and written expression and established goals to improve his abilities in these areas. AR at 1658. To achieve these goals, the IEP prescribed 19 hours per week of special education services outside of Orlin's general education. PSOF at 2. The IEP suggested that "[Orlin] would benefit from [specialized] instruction both inside and outside the general

education classroom, in a small group setting, to address his deficits." *Id.* Nine of the 19 hours of weekly specialized instruction were to be devoted to mathematics support outside of the general education setting, for which "[Orlin] require[s] small group instruction." AR at 1094.

Orlin's IEP was later amended seven times between December 2017 and August 2019. PSOF Opp'n ¶ 12.

## B.   2017–18 School Year

### i.   *Orlin's First IEP Amendment (December 4, 2017)*

In August 2017, Orlin enrolled at DCI in the sixth grade. PSOF at 2; DSOF ¶ 11; PSOF Opp'n ¶ 11. Orlin's IEP from Tubman was in effect when he enrolled at DCI. PSOF at 2. For the special education hours outside of general education, DCI placed Orlin in a self-contained classroom with other students with intellectual disabilities. *Id.* Sometime in September 2017, DCI issued an IEP Amendment Proposed Services Change Form. AR at 457. The document was prepared in English. AR at 1659. In the "Type of Proposed Amendment" section, both "Proposed Increase in Service Hours" and "Proposed Decrease in Service Hours" were checked, though the latter checkmark appears to have been scribbled out, indicating that the proposed amendment purported to increase Orlin's service hours. AR at 457, 1659, 1676. In the narrative section, the form proposed amending Orlin's IEP to change the recommended special education services outside of the classroom from 19 hours per week (or 76 hours per month) to 60 hours per month. AR at 457, 1659. Thus, the actual proposed amendment was a decrease in service hours. AR at 1676. DCI provided Lemus with a translator to discuss the form. PSOF at 3. Lemus signed the form. AR at 457, 1659.

In October 2017, DCI issued a Standard IEP Amendment Form that did not reflect Proposed Services Change Form. AR at 459. The Amendment Form proposed to "add inside hours

8

of 37.5 hours per month (~9.5 hours per week) and increase outside hours from 19 hours per week to 22.5 hours per month (~5.5 hours per week)." AR at 459, 1659. The form misstated that Orlin's outside service hours would be increased when such hours were actually decreased by 53.5 hours per month as compared to Orlin's original IEP. AR at 1676. The Amendment Form stated that "[t]he transition from elementary services to middle school services is the primary reason for the specific hours changes." AR at 459. Members of DCI's special education staff testified at the due process hearing that Orlin was "more advanced" than his peers in the self-contained special education class and that DCI staff did not want to hold Orlin back from receiving a high school diploma. AR at 1660. Lemus signed the Amendment Form and agreed to amend Orlin's IEP without an IEP Team meeting. AR at 459, 1660.

In November 2017, DCI issued an IEP Progress Report analyzing Orlin's progress toward the mathematics, reading, and written expression goals established in his May 2017 IEP. AR at 1660. DCI reported that Orlin had progressed in two mathematics goals and one written expression goal, but that the rest of the goals had not been introduced. AR at 1660, 1176–79.

In December 2017, DCI formally issued Orlin's first IEP amendment. PSOF at 3; AR at 1660. Orlin's levels of academic achievement and goals remained unchanged. AR at 1660. The IEP amendment officially prescribed 22.5 hours per month of specialized instruction outside general education and 37.5 hours per month of specialized instruction inside general education setting. PSOF at 3. At least some portion of the inside general education hours scheduled for Orlin included support from a special education teacher inside the general education classroom. *Id.* Orlin was also placed in mathematics and reading classes in part designed for English learners. *Id.*; AR at 1660.

*ii.   Orlin's Second IEP Amendment (March 5, 2018)*

In February 2018, DCI issued an IEP Progress Report. *Id.* The report noted that, as of that time, three of the goals from Orlin's May 2017 IEP had still not been introduced (one in mathematics and two in reading). AR at 1660, 1180–85. DCI then prepared a Standard IEP Amendment Form that suggested increasing Orlin's specialized instruction from 37.5 hours per month inside general education and 22.5 hours per month outside general education (or 60 hours per month total) to 69.5 hours per *week*. AR at 478, 1661 (emphasis added). In the "Type of Proposed Amendment" section of the form, both "Proposed Increase in Service Hours" and "Proposed Decrease in Service Hours" were checked, though the latter checkmark appears to have been scribbled out. AR at 479, 1659. DCI discussed the proposed amendment with Lemus via a Spanish-language translator but only provided a written copy of the proposed amendment in English. PSOF at 4; AR at 1840–41. Lemus signed that form agreeing to the amendment without an IEP meeting. AR at 1660.

DCI issued a new amended IEP for Orlin on March 5, 2018. PSOF at 4. The IEP amendment prescribed 22.5 hours of specialized instruction per month outside general education and 47 hours of specialized instruction per month inside general education. *Id.* These amounts, totaling 69.5 hours per month, did not reflect the changes proposed to Lemus through the prior written notice of the proposed amendment, which proposed 69.5 hours per week. AR at 1676. The inside general education hours represented an increase of 9.5 hours over the amount prescribed in the December 4, 2017 IEP amendment. AR at 1661. DCI intended for this extra time to be devoted to math support. PSOF at 4. However, during the 2017–18 school year, DCI scheduled math support outside general education during two periods per week during the second quarter, four periods per week in the third quarter, and no periods during the fourth quarter. AR at 1660.

### iii. Orlin's Third IEP Amendment (May 3, 2018)

DCI measured Orlin's progress toward the IEP goals again in April 2018. AR at 1661. Orlin was reported to be progressing in all three mathematics goals but had made no progress on either written expression goal. AR at 1187, 1190–91. Two of his reading goals had yet to be introduced. AR at 1188–89.

On May 3, 2018, DCI administrators, Orlin's IEP Team, Lemus, and Orlin met for Orlin's first annual IEP meeting. PSOF at 4; AR at 500–27. A Spanish translator assisted Lemus with communication during the meeting. AR at 1662–63. Lemus asked about the purpose of the meeting and wondered if Orlin would have the same IEP. AR at 524, 1677. She also asked about how Orlin was doing in his classes and expressed concern about his ability to pay attention. AR at 524, 1677. DCI shared results of mathematics and reading testing conducted pursuant to the Measure of Academic Progress ("MAP"), a standardized assessment administered by the Northwest Evaluation Association. AR at 1662. The MAP assessment showed that Orlin's skills in these areas had only developed to an approximately second-grade level, four grades behind his then-current grade level. AR at 1662–63. In other words, Orlin's reading skills had not improved and his mathematics skills had deteriorated one grade level since Tubman measured his progress one year earlier. AR at 857–58. Orlin's written expression scores demonstrated a limited ability to produce written English. AR at 1663. At the conclusion of the meeting, DCI issued another IEP amendment that prescribed the same amount of specialized instruction as the March 5, 2018 IEP amendment: 22.5 hours per month of specialized instruction outside general education and 47 hours per month inside general education. PSOF at 4; AR at 494, 1663.

In June 2018, DCI again measured Orlin's progress toward the IEP goals. AR at 1663.

The report noted that Orlin was progressing on all goals. AR at 1192–97. DCI determined that

Orlin had made sufficient academic progress to proceed to the seventh grade. PSOF at 5.

### C. 2018–19 School Year

    *i.  Orlin's Fourth IEP Amendment (September 18, 2018)*

In mid-September 2018, DCI proposed another amendment to Orlin's IEP. AR at 1664.

Specifically, DCI proposed decreasing inside general education hours from 47 hours per month

to 38.5 hours per month. AR at 1208. DCI believed this amendment to be appropriate based on

feedback from Orlin's teachers and additional classroom time devoted to English in the seventh-

grade curriculum. PSOF at 5; AR at 1664. On September 18, 2018, Lemus signed the proposal

form and agreed to the amendment without an IEP meeting. AR at 1208. DCI issued an IEP

amendment that same day reflecting the reduction in specialized instruction inside general

education to 38.5 hours per month. AR at 1219. The prescribed 22.5 hours of specialized

instruction per month outside general education setting remained unchanged. *Id.*

    *ii.  Orlin's Fifth IEP Amendment (November 19, 2018)*

On November 5, 2018, DCI issued another Standard IEP Amendment Form proposing to

amend Orlin's IEP to add counseling services to address an observed "increase in negative

behaviors." PSOF at 5; AR at 1664. These counseling services constituted the "Introduction of a

New Service Type." AR at 1235. The form proposing the IEP amendment did not explicitly

propose how much time DCI suggested Orlin spend in counseling. AR at 1235, 1237, 1664.

Instead, DCI proposed changing Orlin's total special education services from 61 hours per month

(representing the combination of specialized instruction inside and outside general education in

Orlin's IEP) to 63 hours per month (apparently representing the total specialized instruction in

the IEP plus the proposed increase of two hours per month to be spent in counseling). AR at

1235, 1237, 1664. Lemus signed that form and agreed to the amendment without an IEP

meeting. AR at 1237, 1664. That same month, DCI issued an IEP Progress Report noting that

Orlin was progressing on all academic goals except for one reading goal that had not been

introduced. AR at 1330–34, 1664–65. On November 19, 2018, DCI issued an IEP amendment

leaving Orlin's specialized instruction unchanged but adding 120 minutes, or two hours, per

month of behavior support services. AR at 1249.

  *iii. Orlin's Sixth IEP Amendment (April 25, 2019)*

  In February 2019, DCI issued a quarterly progress report. AR at 1665. DCI reported that

Orlin was progressing on his mathematics and written expression goals as well as one of the

reading goals but that he refused to produce written work product in several classes. AR at 1335–

37, 1665. That spring, Orlin took a standardized assessment of English and mathematics

readiness for college and career. AR at 870, 1666. Orlin received a performance level score of

1—a rating of "did not yet meet expectations for 7th grade learning standards"—the lowest score

available for both sections. AR at 870, 872. The report noted that Orlin scored better than only

one percent of students at DCI in both sections. AR at 871, 873. The report further compared

Orlin's scores that year with his scores from the previous year and illustrated how those scores

fell from 2018 to 2019. AR at 871, 873. Specifically, Orlin scored better than only one percent of

students in the District of Columbia who took the English-language portion of seventh-grade test,

though the previous year he had scored better than eight percent of students taking the sixth-

grade test in the District of Columbia. AR at 871. Furthermore, Orlin scored better than only

eight percent of students in the District of Columbia who took the mathematics portion of

seventh-grade test, though the previous year he had scored better than sixteen percent of students taking the sixth-grade test in the District of Columbia. AR at 873.

On April 25, 2019, DCI administrators, Orlin's IEP Team, Lemus, and Orlin met for Orlin's annual IEP meeting. PSOF at 6. A Spanish-language translator attended the meeting and translated for Lemus. AR at 1668. The team discussed that Orlin's English language proficiency was "emerging," a classification for someone who "uses some social English and general academic language with visual and graphic support." AR at 1667. In discussing Orlin's mathematics progress, the IEP Team described that Orlin's mathematics skills remained at an approximately second-grade level and that his mathematics standardized test scores fell between the fall of 2018 and winter of 2019. PSOF at 6; AR at 607, 1667. Orlin's reading test scores demonstrated a reading ability at the first-grade level. AR at 610, 1667–68. In other words, Orlin's mathematics scores had not improved at DCI and his reading had deteriorated one-grade level as compared to his 2017 assessment at Tubman. AR at 351. Orlin received grades of mostly zero in written expression. AR at 613, 1668. Finally, the IEP Team noted that Orlin's engagement with his behavior support services was "inconsistent." AR at 615, 1668.

That same day, DCI issued an IEP amendment largely prescribing the same type and quantity of support services as his previous IEP amendment. AR at 1668. Specifically, the specialized instruction inside general education (38.5 hours per month) and behavioral support services (two hours per month) remained unchanged but Orlin's specialized instruction outside general education was increased by a mere 30 minutes per month, from 22.5 hours per month to 23 hours per month. AR at 617, 1668.

**D. 2019–20 School Year**

    *i. Orlin's Seventh IEP Amendment (August 26, 2019)*

In June 2019, DCI again reported on Orlin's progress. AR at 1668. Orlin was reported to be progressing on all goals except for one reading goal. *Id.* DCI determined that Orlin had made sufficient academic progress to proceed to the eighth grade. *Id.* That same month, a psychologist conducted a bilingual neuropsychological evaluation. AR at 1669. The psychologist noted that DCI made the referral "due to a request for more data given recent misbehaviors and concern that [Orlin's] initial psychological evaluation did not fully investigate prior head trauma." AR at 889. Various tests administered by the psychologist demonstrated that Orlin possessed "low" or "very low" cognitive functioning in both English and Spanish. AR at 889–905, 1669. The psychologist concluded that the "[r]esults from this evaluation report support continued eligibility as a student with an Intellectual Disability." AR at 896. The evaluation did not make any specific findings regarding Orlin's head trauma beyond noting that the previous psychologist "was unable to confirm if [those injuries] resulted in concussions or loss of consciousness." AR at 890. In July 2019, DCI issued a new Final Eligibility Determination reclassifying Orlin's disability as "Traumatic Brain Injury" or "TBI." AR at 1384, 1670.

In August 2019, following the disability reclassification, DCI again amended Orlin's IEP and prescribed the same specialized instruction inside general education (38.5 hours per month), specialized instruction outside general education (23 hours per month), and behavioral support services (two hours). AR at 1422, 1672. The IEP added a new service of occupational therapy for three hours per month, based on Orlin's disability reclassification as TBI, as well as two new behavioral goals. AR at 1420–22, 1672.

In the fall of 2019, Orlin scored in the fourth percentile on the MAP report. AR at 879, 1672. This score represented a slight increase from his spring 2018 score in the third percentile. AR at 879, 1672. In reading, Orlin scored in the ninth percentile in the fall of 2019, a significant decrease from his spring 2018 score in the seventeenth percentile. AR at 879, 1672. DCI attributes declines in Orlin's MAP scores to "attendance and behavior concerns." PSOF at 6.

Orlin was expelled from DCI in early February 2020 following a disciplinary incident. AR at 1653.

### E.  Procedural History

#### i.   The Due Process Hearing

On July 30, 2020, Lemus, represented by counsel, filed a due process complaint with the Office of the State Superintendent of Education ("OSSE") for the District of Columbia. PSOF at 7. Lemus sought not only a reversal and expungement of the expulsion, but also compensatory education for Orlin's entire tenure at DCI, alleging that DCI failed to provide Orlin's required FAPE. AR at 1653. The Hearing Officer presiding over the action separated Lemus's claims about the expulsion from her claim alleging failure to provide FAPE.[7] *Id.* The following issues were certified for the FAPE portion of the due process hearing:

1) Whether [DCI] failed to provide [Orlin] an appropriate Individualized Education Program for the 2017–18 school year;

2) Whether [DCI] failed to implement [Orlin's] 2017–18 IEP;

3) Whether [DCI] failed to provide an appropriate IEP on May 3, 2018 for the 2018–19 school year[;] and

---

[7] The Hearing Officer considered the expulsion portion of the hearing first because a complaint involving expulsion is entitled to expedited treatment. AR at 1653. The Hearing Officer determined that DCI had not improperly expelled Orlin, and Lemus appealed that decision to this Court. *See Lemus on behalf of O.C.L. v. Dist. of Columbia Int'l Charter Sch.*, No. 20-cv-3839 (RCL). This Court's review of the Hearing Officer's expulsion determination is the subject of a separate Memorandum Opinion.

4) Whether [DCI] failed to provide an appropriate IEP on April 25, 2019 for the 2019–20 school year.

PSOF at 7; AR at 1657.

OSSE held hearings on these questions on October 14 and 15, 2020. PSOF at 7. Lemus called two witnesses, Dr. Jay Lucker and herself. AR at 1657. Lemus offered Dr. Lucker as an expert in communications and DCI objected. *Id.* The Hearing Officer overruled DCI's objection and qualified Dr. Lucker as an expert in communications but limited his testimony to deficiencies in English proficiency. *Id.* DCI offered as witnesses DCI's special education coordinator, Kimberly Colley, as well as four DCI special educator teachers: Celia Taylor, Fatoumata Magassa, Michael Thomas, and Justin LaRoque. *Id.* All five of DCI's witnesses were qualified as experts in special education without objection. PSOF at 7.

The Hearing Officer issued a decision on October 26, 2020 finding in favor of DCI in part and in favor of Lemus in part. *Id.* The Hearing Officer determined that DCI bore the burden of persuasion on the first, third, and fourth certified issues because those issues concerned DCI's alleged failure to develop an appropriate IEP and Lemus, the petitioner, had established a prima facie case that those IEP amendments were inappropriate. AR at 1674. The Hearing Officer determined that Lemus bore the burden of persuasion on the second certified issue, whether DCI failed to implement Orlin's 2017–18 IEP. *Id.* The Hearing Officer found in favor of DCI on the second certified issue but found in favor of Lemus on the remaining issues. PSOF at 7. The Hearing Officer further determined that Lemus had not offered any evidence of the type or amount of compensatory education services to which Orlin was entitled and therefore concluded that a specific award of compensatory services would be arbitrary. AR at 1680–81.

The Hearing Officer then ordered the following relief:

(1) [DCI] shall fund a total of 100 hours of independent tutoring services for [Orlin] in Reading, Mathematics, and Written Expression, with no restrictions as to the time of day or deadlines for the completion of such services[;]

(2) [DCI] shall fund an independent evaluation to determine (1) how much academic growth could be reasonably be expected of [Orlin] with an appropriate IEP (i.e., 19 hours/week of specialized instruction outside general education) since December 4, 2017, and (2) what kind and amount of services would put [Orlin] in the academic position [he] would have been in had [DCI] provided [him] 19 hours/week of specialized instruction outside general education from December 5, 2017 until February 6, 2020[; and]

(3) Within thirty (30) days of receipt of the independent evaluation, [DCI] shall convene an Multidisciplinary Team meeting to review the evaluation and to determine an appropriate amount of compensatory education services for the lack of an appropriate amount of specialized instruction outside of general education for [Orlin] for the period December 5, 2017 to February 6, 2020.

AR at 1682.

### ii. The Instant Action

On January 25, 2021, the last day of the limitations period, DCI filed this action seeking declaratory and injunctive relief under the IDEA. Compl, ECF No. 1. Specifically, DCI asks that this Court reverse the Hearing Officer's decision and enter judgment for DCI. *Id.* at 16. DCI alleges that the Hearing Officer erred in nearly two dozen ways during the due process hearing. *See id.* ¶¶ 64–85. In response, Lemus moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (2) for DCI's failure to timely serve her. Def.'s Mot. to Dismiss, ECF No. 9. The Court denied Lemus's motion, finding good cause for DCI's failure to effect service of process on Lemus within the applicable period. *Lemus on behalf of O.C.L. v. Dist. of Columbia Int'l Charter Sch.*, Case Nos. 20-cv-3839 (RCL), 21-cv-0223 (RCL), 2022 WL 407151 (D.D.C. Feb. 10, 2022). Around that same time, DCI moved to stay the Hearing Officer's relief order pending its appeal to this Court. Stay Mot., ECF No. 13. Lemus opposed, ECF No. 22, and DCI replied, ECF No. 23. The Court

denied DCI's motion, finding that a stay was not warranted. *Dist. of Columbia Int'l Charter Sch. v. Lemus*, Case No. 21-cv-0223 (RCL), 2022 WL 873549 (D.D.C. Mar. 24, 2022).

The parties then both moved for summary judgment. Pl.'s Cross Mot. for S.J., ECF No. 29; Pl.'s Mem. in Supp. of Pl.'s Cross Mot. for S.J. ("Pl.'s MSJ"), ECF No. 29-1; Def.'s Mot. for S.J. ("Def's MSJ"), ECF No. 30. Each filed an opposition to the other's motions.[8] Pl.'s Mem. in Opp'n to Def.'s MSJ ("Pl.'s Opp'n"), ECF No. 32; Def.'s Mem. in Opp'n to Pl.'s MSJ ("Def.'s Opp'n"), ECF No. 33. DCI filed a reply in support of its own motion. Pl.'s Reply, ECF No. 34. Lemus filed a reply after twice moving to extend the deadline. Def.'s Reply, ECF No. 48. Both motions are ripe for review.

### III.   LEGAL STANDARDS

#### A. Summary Judgment

In ordinary civil actions, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court evaluating a summary judgment motion must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Arthridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010).

---

[8] While Lemus's counsel captioned her submission as a memorandum in opposition to her *own* summary judgment motion, the content of the filing indicates that it is an opposition to DCI's summary judgment motion.

### B.  Judicial Review Under the IDEA

Under the IDEA, "[a]ny party aggrieved by the findings and decision" rendered during administrative proceedings before the local educational agency may "bring a civil action" in state or federal court without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2)(A). The reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* at § 1415(i)(2)(C)(i)–(iii). The IDEA requires reviewing courts to afford "less deference than is conventional in administrative proceedings," *Reid*, 401 F.3d at 521 (internal quotation marks and citation omitted), but "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *Roark ex rel. Roark v. Dist. of Columbia*, 460 F. Supp. 2d 32, 38 (D.D.C. 2006) (internal citation omitted). Overall, courts are not to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

The party challenging the Hearing Officer's determination "take[s] on the burden of persuading the court that the hearing officer was wrong." *Reid*, 401 F.3d at 521 (internal citation and quotation marks omitted). That party must demonstrate by a preponderance of evidence that the Hearing Officer erred. *See Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988).

### IV.  DISCUSSION

The various errors that DCI claims the Hearing Officer committed may be summarized as the following four: (1) finding that Lemus's claims related to IEPs developed prior to July 30, 2018 were not time-barred; (2) determining the DCI had the burden of persuasion at the due process hearing; (3) finding that the December 4, 2017, May 3, 2018, and April 25, 2019 IEP amendments were not appropriate; and (4) awarding an arbitrary amount of tutoring hours and

impermissibly delegating to the IEP Team the responsibility to determine the rest of the

compensatory education services award. Pl.'s MSJ at 10–33. Lemus argues that the Hearing

Officer did not err in these ways. *See generally* Def.'s MSJ; Def.'s Opp'n.

DCI brings this action and thus bears the burden to convince this Court that the Hearing

Officer erred. *Reid*, 401 F.3d at 521. After review, the Court concludes that DCI has not

demonstrated that the Hearing Officer erred in any the ways DCI suggests except for the relief

order. Thus, because DCI has not met its burden, Lemus is entitled to summary judgment on

most points.

That said, the Court would be remiss if it did not remark on the unprofessional quality of

Lemus counsel's representation here, the likes of which this Court has rarely seen. Counsel's

briefs fail to include citations to the administrative record; spill ink on arguments that have no

basis in law or the procedural posture of this case; fail to respond to DCI's arguments; omit,

mischaracterize, or misapply law; and repeat information unrelated to the case.[9] Furthermore,

counsel twice improperly and inadequately attempted to correct some of these missteps through

late-filed documents without notifying DCI or seeking leave of this Court.[10] Because "formal

pleadings drafted by lawyers" are held to "stringent standards," *Estelle v. Gamble*, 429 U.S. 97,

106 (1976), briefing so lacking in quality, such as these, would ordinarily result in a court

---

[9] Some of the arguments that Lemus's counsel raises here concern matters that were not raised in the administrative due process complaint, and thus they were not before the Hearing Officer. *See, e.g.*, Def.'s MSJ at 25–27 (claiming that DCI violated standardized testing requirements and the Lemuses' statutory rights as non-English speakers); Def.'s Opp'n at 9–10 (claiming the DCI failed to provide procedural safeguards). Because these matters were not properly raised during the due process hearing, the Hearing Officer did not consider them. *Adams v. Dist. of Columbia*, 285 F. Supp. 3d 381, 394 (D.D.C. 2018). Nor will this Court.

[10] It is difficult for the Court to express the gravity of the filings' shortcomings but will attempt to do so with a few examples of the rudimentary mistakes and typographical errors contained therein. This includes basic factual mistakes, "The IEP determined that 10 of those hours of… and 9 hours of… AR at __[,]" Def.'s MSJ at 6, and "DCI filed it's. Amended Third Answer on …. AR at …[,]" *id.* at 9; failing to correct her word processor's autocorrecting of (c) and (e) into © and €, "20 U.S.C. 1414 (d)(2)©(i)[,]" *id.* at 27; "citing Section 1400 €, 1401[,]" Def.'s Opp'n at 9; and blatant typographical errors, "Lemus, throuhot this period, worked onlg hours as a ….. to support her family…[,]" Def.'s Reply at 16 n.1.

finding in favor of the opposing party. Lemus is fortunate that she prevails in large part. The Court reaches this outcome solely because DCI has fallen short of its burden and this Court will in its discretion not penalize Lemus based on any performance by her counsel.

## A. The Court Will Grant DCI's Motion to Strike Lemus's "Status Report"

The parties ask this Court to base its decision on the evidence in the record, though Lemus asks that that record include a so-called "Status Report" filed one month after Lemus's reply to DCI's opposition to her motion for summary judgment. ECF No. 49. The "report" contained an evaluation by Dr. Lucker, one of Lemus's witnesses at the due process hearing, purportedly conducted on June 29, 2022. *Id.* Attached as exhibits were various other evaluation reports, some of which were duplicates of reports already present in the record. Ex. A–E to Status Report, ECF No. 49-1–49-5. DCI moves to strike the report, claiming that "[Lemus] effectively filed a supplement to her reply well after the deadline and without leave of this Court." Pl.'s Mot. to Strike, ECF No. 50, at 1. Lemus opposes and, after spending several pages on irrelevant procedural history, argues that the document is the independent evaluation report ordered by the Hearing Officer. Def.'s Opp'n to Mot. to Strike, ECF No. 51, at 3. DCI, curiously not confirming or denying whether this was the report it funded as required by the Hearing Officer, instead calls the report "extremely prejudicial" and attacks the report's substance and timing. Pl.'s Reply to Def.'s Opp'n to Mot. to Strike, ECF No. 52, at 1–3 (arguing that the report does not meet the requirements of the Hearing Officer's order, that it addresses topics outside the scope of the due process hearing and the Hearing Officer's order, and that Lemus has not offered any explanation for why she did not submit it prior to close of dispositive motions even though it was available, among other arguments).

A court may strike "any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). Although "the rule does not by its terms require the striking of matters that are prejudicial," "many courts will grant such motions only if the portions sought to be stricken are prejudicial or scandalous." *Nwachukwu v. Rooney*, 362 F. Supp. 2d 183, 190 (D.D.C. 2005) (collecting cases). "The Court, possessing considerable discretion in disposing of motions to strike, is mindful that motions to strike are not favored." *Cobell v. Norton*, 224 F.R.D. 1, 2 (D.D.C. 2004). Nevertheless, the Court finds that Lemus's so-called "status report," filed late without leave of court and replete with duplicative, irrelevant, or prejudicial material, more than meets the demanding showing required in this District's Rule 12(f) caselaw. Thus, the Court will grant DCI's motion to strike and will not consider the document's contents, or the exhibits attached thereto, in its consideration of the parties' summary judgment motions.

## B. The Hearing Officer Correctly Determined That Lemus's Challenges to IEPs Issued Prior to July 30, 2018 Were Not Time-Barred

DCI argues that the Hearing Officer erred by concluding that Lemus's challenges to the appropriateness of Orlin's IEPs amendment issued prior to July 30, 2018—specifically his first and second IEP amendments—were time-barred. Pl.'s MSJ at 10–12. Lemus denies that the Hearing Officer erred in this way. Def.'s MSJ at 1–2; Def.'s Reply at 12–13.

Under the IDEA, a parent must "request an impartial due process hearing within 2 years of the date the parent [] knew or should have known about the alleged action that forms the basis of the complaint[.]"[11] 20 U.S.C. § 1415(f)(3)(C); 34 C.F.R. § 300.511(e). The Hearing Officer correctly identified that the statute of limitations issue here "turns on whether [Lemus] knew or should have known about key elements of the IEPs developed prior to July 30, 2018." AR at

---

[11] The statute and corresponding regulation contain two exceptions to the limitations period that are not implicated here. 20 U.S.C. § 1415(f)(3)(D); 34 C.F.R. § 300.511(f); AR at 1675.

1675. And the Hearing Officer correctly identified that, under IDEA regulations, the school must

provide written notice to the child's parents before amending the child's IEP. 34 C.F.R.

§ 300.503(a). Such notice must be provided in the parent's native language. *Id.* § 300.503(c).[12]

The Hearing Officer then found that DCI did not provide Spanish-language versions of the

relevant documents and thus violated the applicable regulation. AR at 1675. The Hearing Officer

went on to thoroughly describe how the various documents presented to Lemus were "confusing

even to someone who is perfectly literate in English." AR at 1675; 1675–77 (describing how

markings indicated that Orlin's support hours would be increased but his hours were decreased

or vice versa and how the forms confused hours per week and hours per month, among other

errors). Examining this evidence, the Hearing Officer concluded that although the forms' marks

"may have been the result of [] innocent error[s]" by the DCI staff member preparing the

documents, AR at 1676, "[t]he documentation and testimony offered at the hearing" confirmed

that "[Lemus] did not know, and cannot be held responsible for knowing, the significance of the

changes [DCI] made to [Orlin's] IEP during the 2017-18 school year." AR at 1677.

　　DCI does not attempt to excuse its failure to provide the documentation in Spanish. Nor

does DCI contradict the Hearing Officer's characterization of the forms' impenetrability. Rather,

DCI argues that Lemus was on notice of Orlin's IEP amendments, the actions giving rise to her

complaint, prior to the limitations period because a) Lemus was provided with a translator at

certain meetings where the IEP amendments were discussed, b) Lemus consented to the

amendments to Orlin's IEP without asking additional questions or seeking clarification, and c)

---

[12] Lemus cites the applicable authority as "the D.C. Language Access Act, DC code 2-1931 et seq, and the D.C. Human Rights Act, DC Code 2-1401.01, 5 -E DCMR 2600 et seq and 5-E DCMR 3102." Def.'s MSJ at 18. However, as DCI aptly points out, neither statute nor their associated regulations are applicable here. Pl.'s Opp'n at 3 (noting that District of Columbia regulations related to educational language minority students do not apply to students in a charter school like DCI and further noting that DCI is not a "covered entity" under the D.C. Language Access Act).

overall, Lemus failed to exercise reasonable diligence in trying to obtain more information about DCI's actions to amend Orlin's IEP. Pl.'s MSJ at 10–12.

All of DCI's arguments miss the mark. DCI did not provide Lemus with Spanish language versions of the applicable documents as required by the IDEA regulations. Moreover, not only were the forms DCI provided objectively confusing, Lemus demonstrated at the due process hearing that DCI's conduct was subjectively confusing as well. According to the meeting notes for the May 3, 2018 IEP Annual Review Meeting, Lemus asked what the purpose of the meeting was and whether DCI would be making changes to Orlin's IEP, among other questions. AR at 1677. The Hearing Officer credited Lemus's testimony at the due process hearing that DCI did not answer either of those questions. *Id.* This response falls short of DCI's requirement to "take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting." 34 C.F.R. § 300.322(e).

Furthermore, DCI cannot credibly assert that Lemus knowingly and willingly agreed to the amendments to Orlin's IEP or failed to exercise reasonable diligence.[13] DCI told her in writing, in a language that she did not understand, that the school would be amending Orlin's IEP in certain ways, yet the actual IEP amendments often did not reflect the proposed changes. Even if Lemus understood the proposed changes, a proposition for which the record illustrates considerable doubt, it cannot be said that she agreed with an IEP amendment that differed from DCI's proposal. For this reason, courts recognize that a failure to provide written notice can constitute a denial of FAPE when, such as here, the action impedes a parent's opportunity to

---

[13] Relatedly, Lemus is incorrect that "DCI asserts, without legal foundation whatsoever, that [Lemus] consented to all of the changes that were made to the IEPs in question." Def.'s Opp'n at 13 (internal quotations omitted). Lemus clearly signed various IEP documents indicating her consent and verbally agreed with DCI in meetings. However, it was the Hearing Officer's position that these acts indicating consent cannot be considered as true consent due to DCI's failure to inform Lemus. The Court agrees.

participate in the process of developing the FAPE. *See Lesesne ex rel. B.F. v. Dist. of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006); *Brown v. Dist. of Columbia*, 179 F. Supp. 3d 15, 24–25 (D.D.C. 2016); *see also* 20 U.S.C. § 1415(f)(3)(E)(ii)(II).

Overall, the Hearing Officer conducted his own review of the documents provided to Lemus regarding the proposed changes to Orlin's IEP and observed Lemus's testimony. Based on this evidence, the Hearing Officer correctly concluded that Lemus did not know nor should she have known the alleged action forming the basis of her complaint prior to July 30, 2018. Therefore, the Hearing Officer did not err in finding that Lemus's claims were not time-barred, and Lemus is entitled to summary judgment on this point.

### C. The Hearing Officer Correctly Determined That DCI Had the Burden of Persuasion to Demonstrate that the December 4, 2017, May 3, 2018, and April 25, 2019 IEP Amendments Were Appropriate

DCI next argues that the Hearing Officer erred in shifting the burden of persuasion from Lemus on all three points. Pl.'s MSJ at 12–21; Pl.'s Opp'n at 2–3; Pl.'s Reply at 3. Lemus argues that the Hearing Officer correctly determined that DCI had the burden of persuasion. Def.'s MSJ at 16; Def.'s Opp'n at 6; Def.'s Reply at 1–2.

Ordinarily, "the party who filed for the due process hearing shall bear the burden of production and the burden of persuasion" at that hearing. D.C. Code Ann. § 38–2571.03(6)(A). When the dispute involves "the appropriateness of the child's individual educational program or placement," and the parent "establish[es] a prima facie case" that such IEP or placement is inappropriate, then "the public agency shall hold the burden of persuasion." *Id.* "In determining the sufficiency of a prima facie case," the hearing officer "must determine whether, after considering all of a [parent's] evidence, a reasonable trier of fact could find in favor of the [parent]." *W.S. v. District of Columbia*, 502 F. Supp. 3d 102, 121 (D.D.C. 2020). As this Court has previously explained, "[p]resenting a prima facie case is not a heavy burden—all that is

required is that plaintiff provided 'enough evidence' to justify sending a case to a jury." *Dist. of Columbia Int'l Charter Sch.*, 2022 WL 873549, at \*4 (citing *W.S.*, 502 F. Supp. 3d at 120).

Here, the Hearing Officer determined that Lemus had made a prima facie case that the December 4, 2017 IEP amendment was inappropriate. AR at 1678. This finding appears to be based partly on DCI's failure to inform Lemus of the changes, as discussed above, and partly on a comparison of Orlin's original IEP with the December 4, 2017 IEP amendment. Specifically, the December 4, 2017 IEP amendment reduced Orlin's specialized instruction outside general education by 53.5 hours per month—or 70%—despite recognizing that his performance levels in mathematics, reading, and written expression had not improved. *Id.* Based on this evidence, the Hearing Officer concluded that Lemus had established a prima facie case of a FAPE denial. Furthermore, the Hearing Officer sensibly concluded that because the May 3, 2018, and April 25, 2019 IEP amendments "reflect[ed] the reduced level of specialized instruction services prescribed by [DCI]" in the December 4, 2017 IEP amendment, Lemus had established a prima face case for challenging those IEP amendments as well. AR at 1679.

DCI repeatedly insists that Lemus did not establish a prima facie case because her own testimony did not directly express disagreement with or question the IEP amendments and because her only other witness, Dr. Lucker, should not have been permitted to provide expert testimony. Pl.'s MSJ at 12–21; Pl.'s Opp'n at 2–3; Pl.'s Reply at 3. This argument is mistaken for at least three reasons. First, as previously discussed, DCI's demonstrated failure to inform Lemus of the scope and nature of the proposed changes to Orlin's IEP amendments undercuts any insistence that her statements or lack thereof are somehow probative. Second, as Lemus correctly notes, nothing in the text of the Hearing Officer's decision indicates that he credited Dr.

Lucker's testimony at all, let alone on the burden of persuasion.[14] Def.'s Opp'n at 12–13. In fact, the Hearing Officer expressly noted that while "[Dr. Lucker] opined that [DCI] should not have reduced student's intensive specialized instruction without conducting evaluations," "there is no justification for the independent evaluations requested by [Lemus]." AR at 1680. Third, DCI fails to cite any proposition in law or statute mandating that a prima facie case be established only through testimonial evidence. To the contrary, a hearing officer is explicitly required to review all of the petitioner's evidence in the record, not just the testimony. *See W.S.*, 502 F. Supp. 3d at 121. Thus, the Hearing Officer here correctly considered the objective assessments, meeting notes, and other documentation submitted by Lemus to conclude that she had established a prima facie case.

Next, DCI argues that the Hearing Officer did not sufficiently credit the testimony of Colley and Taylor, members of DCI's special education staff, who testified that Orlin was "more advanced" than his peers in the outside special education classes and that he would be better served by participating in mathematics and reading support classes inside general education and reducing his outside general education time. AR at 1677–78. However, the Hearing Officer evidently determined that this testimony was less credible than other data demonstrating that Orlin's performance levels had not improved, suggesting that a reduction in outside general education hours was not appropriate. Because "a District Court must accept the [hearing officer's] credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion," and the Court sees no basis in the record to contradict the Hearing Officer's determination, the Court concludes that did the Hearing Officer did not err in

---

[14] It is for this reason that the Court need not address DCI's arguments that the Hearing Officer erred by allowing Dr. Lucker to testify as an expert.

assigning the burden of persuasion to DCI. *See J.N. v. Dist. of Columbia*, 677 F. Supp. 2d 314, 322 (D.D.C. 2010) (emphasis removed).

The Court agrees with the Hearing Officer that the record unequivocally establishes a prima facie case of FAPE denial and thus the burden of persuasion shifted to DCI to demonstrate that the December 4, 2017 IEP was appropriate. Furthermore, the Court agrees with the Hearing Officer's conclusion that, based on his observations and expertise, the May 3, 2018 and April 25, 2019 IEP amendments were linked to, and suffered from similar deficiencies as, the December 4, 2017 IEP amendment. Additionally, objective evidence in the record showing a plateau or decline in Orlin's test scores is further evidence in support of a prima facie case. Finally, the Court should "defer to the [hearing officer's] factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." *See S.S. by and through Street v. Dist. of Columbia*, 68 F. Supp. 3d 1, 9–10 (D.D.C. 2014) (internal citations omitted). Finding no persuasive, contrary evidence, the Court gives deference to the Hearing Officer's determination that the burden of persuasion shifted from Lemus to DCI. Therefore, the Hearing Officer did not err in finding that DCI had the burden of persuasion to demonstrate that the IEP amendments were not appropriate, and Lemus is entitled to summary judgment on this point.

### D. The Hearing Officer Correctly Determined That the December 4, 2017, May 3, 2018, and April 25, 2019 IEP Amendments Were Not Appropriate

DCI next argues that the Hearing Officer erred in determining that DCI had not met its burden to establish that Orlin's second, third, and sixth IEP amendments were appropriate because he substituted his own education policy opinions for those of DCI's experts. *See* Pl.'s MSJ at 16–20; 23–26; 28–31. Lemus argues that DCI does not meet its burden to demonstrate that any of these findings were incorrect. Def.'s Opp'n at 4–5; Def.'s Reply at 15–16. The Court will address the Hearing Officer's findings regarding each IEP amendment in turn.

     *i.   December 4, 2017 IEP Amendment*

The crux of DCI's objection to the Hearing Officer's conclusion that the December 4, 2017 IEP amendment was not appropriate appears to be the Hearing Officer's observation that "[DCI] apparently rejected the option of developing individualized lesson plans for [Orlin] in the small class setting to meet [Orlin's] unique needs" as an impermissible substitution of his own view of the correct educational policy rather than giving deference to DCI. Pl.'s MSJ at 19; AR at 1678. DCI misconstrues the Hearing Officer's conclusion. He did not conclude that the December 4, 2017 IEP amendment was inappropriate because DCI failed to develop individualized lesson plans. Rather, he concluded that DCI failed to meet its burden to demonstrate why significantly reducing Orlin's specialized instruction outside general education from 19 hours per week (as stated in his May 11, 2017 IEP) to 22.5 hours per month (as stated in the December 4, 2017 IEP amendment) was appropriate. The Hearing Officer's conclusion was amply supported by several pieces of evidence in the record, including Orlin's testing data and recognition that Orlin's levels of achievement in mathematics, reading, and written expression had not changed.

DCI responds by saying that the Hearing Officer erred by basing his decision only on objective data rather than the expert opinions of individuals who worked with Orlin. Pl.'s MSJ at 21–23. The regulatory provision that DCI cites for this proposition, 34 C.F.R. § 300.113, is inapplicable here because that provision requires that schools routinely check children's hearing aids, and Orlin does not possess a hearing impairment. Regardless, DCI's argument elides the point. The Hearing Officer clearly considered both objective and subjective data. He determined that "[DCI] has identified none of the assessments it suggests supported the reduction in specialized instruction outside general education," that the evidence DCI did present "indicate[d] that no such assessments were conducted, or the results were not considered in making the

determination to reduce drastically [Orlin's] service hours outside general education," and that "[DCI's] justification for removing [Orlin] from most of [his] self-contained classes," namely that he could receive small-group support inside general education, was "unpersuasive." AR at 1678. This Court recognizes the Hearing Officer's expertise in assessing a school's explanation for an IEP amendment and will afford such a reasoned determination deference. *See D.K. v. Dist. of Columbia*, 983 F. Supp. 2d 138, 144 (D.D.C. 2013); *Reid*, 401 F.3d at 521.

DCI's arguments about the other ways that the Hearing Officer erred are similarly unavailing. DCI insists that Lemus did not offer any evidence or testimony to demonstrate that the December 4, 2017 IEP amendment was inappropriate. Pl.'s MSJ at 16. But it was DCI, the party with the burden of persuasion, not Lemus, who needed to demonstrate that the December 4, 2017 was appropriate. DCI further rehashes its claims that the Hearing Officer did not give due weight to testimony by DCI witnesses Colley or Taylor, who worked with Orlin, and gave too much weight to testimony by Lemus's witness, Dr. Lucker. *Id.* at 17–18. As previously stated, nothing in the relevant portion of the Hearing Officer's decision indicated that he considered Dr. Lucker's testimony in determining the appropriateness of the December 4, 2017 IEP amendment. In contrast, the Hearing Officer plainly considered Colley and Taylor's testimony and weighed this testimony against other evidence in the record. Though their testimony is due some deference, it is well-established that "the required deference to the opinions of the professional educators [does not] somehow relieve the hearing officer or the district court of the obligation to determine as a factual matter whether a given IEP is appropriate." *Cnty. Sch. Bd. of Henrico Cnty., Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 307 (4th Cir. 2005). Similarly, "the fact-finder is not required to conclude that an IEP is appropriate simply because a teacher or other professional testifies that the IEP is appropriate." *Id.*

Finally, DCI contends that the Hearing Officer's conclusion that DCI "reduc[ed Orlin's] intensive services by over 70%" is not accurate because Orlin continued to receive specialized instruction inside general education. Pl.'s MSJ at 19; AR at 1678. This, like DCI's other arguments, confuses the issues. Orlin's original IEP amendment called for 19 hours per week of specialized instruction outside general education, or 76 hours per month. The December 4, 2017 IEP amendment prescribed 37.5 hours of specialized instruction per month inside general education and 22.5 hours of specialized instruction per month outside general education. The Hearing Officer's statement, though a bit imprecise, was accurate in describing a 70% reduction in outside general education services.

Therefore, the Hearing Officer did not err in determining that DCI failed to demonstrate that Orlin's December 4, 2017 IEP amendment was appropriate, and Lemus is entitled to summary judgment on this point.

### ii. *May 3, 2018 IEP Amendment*

The Hearing Officer concluded that Orlin's third amended IEP was not appropriate for the 2018–19 school year because "[a]fter implementing the changes in December 2017, data reveals that [Orlin] had made no objective improvement in Math or Reading, and had made limited progress on [his] IEP goals when [his] May 3, 2018 IEP was developed." AR at 1679. The Hearing Officer looked to several pieces of evidence to reach this conclusion. First, the Hearing Officer noted that Orlin's original IEP, developed when Orlin was in the sixth grade, indicated that his mathematics and reading abilities were at a third- and second-grade level, respectively. AR at 1678. In the winter of 2018, Orlin's MAP reading assessment placed him at a second-grade level, unchanged from the May 11, 2017 assessment, but his iReady mathematics assessment placed him at the second-grade level, an entire grade level decrease. *Id.* Orlin's MAP mathematics assessment placed him in the second percentile. *Id.* In contrast, DCI's April 2018

progress report indicated that Orlin was progressing on all three mathematics goals and one of the reading goals. AR at 1678–79. The progress report further acknowledged that two reading goals had not been introduced and Orlin was not making any progress on either written expression goal. AR at 1679. Nevertheless, DCI's May 3, 2018 IEP amendment maintained the same level of specialized instruction inside general education from the December 4, 2017 IEP amendment (37.5 hours per month) and prescribed 23 hours per month of specialized instruction outside of general education, an modest increase of 30 minutes per month from the earlier amendment and "well below the 76 hours prescribed on [his] May 11, 2017 IEP." AR at 1678.

DCI first takes aim at the data used by the Hearing Officer. DCI claims that the Hearing Officer failed to consider Orlin's MAP scores and instead "only relied on scores from the iReady program, which the IEP team noted were not an accurate description of his true abilities."[15] Pl.'s MSJ at 24. This contention fails in several ways. The Hearing Officer did not "only rely" on Orlin's iReady scores—the Hearing Officer referenced Orlin's iReady mathematics score in conjunction with his discussion of Orlin's MAP mathematics score, a separate evaluation. Additionally, DCI mischaracterizes the IEP Team's comments regarding the accuracy of the iReady score. In the May 3, 2018 IEP amendment, the IEP Team explained that "[a]s of now, iReady does not have a[] Spanish intensive version therefore [Orlin's] data may not be an accurate description of his true abilities when taught in his native language." AR at 1155. That said, the IEP Team expressed confidence that "[a] breakdown of scores in each subcategory reveal [Orlin's] specific strengths and areas for growth." *Id.* Orlin scored at a second-grade level in all of the measured subcategories and the IEP Team's narrative in each of the subcategories

---

[15] The iReady program was "a diagnostic and instruction program" used in Orlin's intensive mathematics support class at DCI. AR at 1155. The program had "two parts, including an online assessment and online instruction which is individually adapted to each learner's current learning need." *Id.*

indicated that Orlin's difficulty in understanding various mathematics concepts was not only related to his limited understanding of English. AR at 1155–56. Based on this evidence, it appears that the IEP Team indicated that the iReady scores could be useful when viewed in context, which it what the Hearing Officer did.

DCI next argues that, contrary to the Hearing Officer's determination, Orlin's MAP assessments reflected objective progress in reading and mathematics over both the 2017–18 and 2018–19 school years. Pl.'s MSJ at 23–24. In mathematics, DCI notes that "[Orlin] progressed from a 193 in the fall of the 2017-2018 school year to a 215 in the fall of the 2018-2019 school year." But as DCI's own filing acknowledges, "[t]he key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to enable the specific student's progress" [and] . . . "that standard calls for evaluating an IEP as of the time each IEP was created rather than with the benefit of hindsight." Pl.'s MSJ at 9–10 (citing *Z.B.*, 888 F.3d at 524) (internal quotation marks and citation omitted). DCI cannot look to evidence of Orlin's supposed progress in the fall of 2018, as this information was not available to DCI at the time it developed his amended IEP in the winter and spring of 2018. The Hearing Officer instead correctly examined the mathematics assessment scores available to DCI at the relevant time. DCI's argument about Orlin's reading assessments fares no better. DCI insists that Orlin made objective progress in reading from the fall to the spring of the 2017–18 school year and that the Hearing Officer failed to consider this evidence. Pl.'s MSJ at 23–24. Specifically, DCI argues that Orlin's reading scores did improve some fifteen points between the fall of 2018 and the spring of 2018. *Id.* at 24 (citing AR at 879). However, the MAP reading assessment DCI cites does not support the reading and in fact shows a decrease in scores over time. AR at 879.

Finally, DCI argues that the Hearing Officer overgeneralized and failed to properly contextualize the IEP progress reports showing that Orlin was making progress toward his goals. Pl.'s MSJ at 24. Specifically, DCI insists that the Hearing Officer failed to credit testimony by Colley and Taylor stating that Orlin was progressing. *Id.* at 24–25. When assessing a student's progress, courts should defer to the administrative agency's expertise. *See K.S. v. Dist. of Columbia*, 962 F. Supp. 2d 216, 221 (D.D.C. 2013) (internal citation omitted). And, as the Supreme Court has plainly instructed, an IEP that establishes "merely more than *de minimus*" progress is not appropriate. *Endrew F.*, 580 U.S. at 402. Though DCI personnel may have stated that Orlin was making some unquantifiable progress toward his IEP goals, his scores year-over-year show a consistent lack of overall progress. In this way, the record clearly indicates that, faced with evidence that Orlin's mathematics and reading abilities had not changed or worsened since his original IEP, keeping Orlin's specialized instruction hours outside general education the same as the December 4, 2017 IEP amendment and only slightly increasing his inside general education hours appeared to doom Orlin's hopes for academic progress. Based on this evidence, the Court sees no reason to disturb the Hearing Officer's finding that the May 3, 2018 IEP was not appropriate. Therefore, the Hearing Officer did not err in that determination, and Lemus is entitled to summary judgment on this point.

### iii. April 25, 2019 IEP Amendment

The Hearing Officer similarly determined that Orlin's sixth amended IEP, the penultimate amendment before his expulsion, was not appropriate for the 2019–20 school year. AR at 1680. In reaching this conclusion, the Hearing Officer looked to Orlin's lack of objective academic progress. Specifically, the Hearing Officer observed that Orlin's January 2019 MAP assessments in mathematics and reading placed him in lower grade levels than he was in May 2017 at Tubman. AR at 1679. Furthermore, DCI's own IEP progress reports indicated that Orlin

35

was not making any progress in mathematics, reading or written expression. *Id.* Orlin's reading teacher recommended "extensive one-on-one attention." *Id.* Nevertheless, DCI did not alter Orlin's prescription for 23 monthly hours of specialized instruction outside general education. *Id.* The Hearing Officer further noted that DCI failed to provide Lemus with a Spanish-language version of Orlin's April 25, 2019 IEP amendment, in violation of a District of Columbia code provision enacted shortly before the issuance of the IEP amendment. AR at 1680 (citing D.C. Code Ann. § 2–1933) (West 2019)).

DCI's primary contention is that the Hearing Officer narrowly focused on "what he characterizes as a lack of progress on the MAP assessment, and in IEP goals, without considering the context, the impact that the student's behavior and attendance had on his progress, and the team's response to those circumstances." Pl.'s MSJ at 31. DCI argues that testimony by four DCI witnesses—Colley, Taylor, Fatoumata Magassa, another of Orlin's special education teachers, and Michael Thomas, Orlin's English teacher—clearly demonstrated that Orlin's increasing absences and disruptive behavior hindered his academic progress, and that, even so, DCI took significant steps to support Orlin. *Id.* at 29–30. For example, DCI developed a functional behavioral assessment and behavior implementation plan to address the behavior, continued to provide small group and individualized instruction inside the classroom, and offered various accommodations. *Id.* at 29. DCI claims that the Hearing Officer erred by not referencing these witnesses' testimony or their consistent belief that the April 25, 2019 IEP amendment appropriately supported Orlin. *Id.* at 31.

These arguments, like DCI's attempts to defend the previous IEPs, lack merit. Other evidence in the record clearly showed that Orlin's academic skills were not progressing at DCI. In the face of this conflicting evidence, the Hearing Officer was not required to give deference to

DCI personnel's opinions about Orlin's progress. *See Dist. of Columbia Int'l Charter Sch.*, 2022 WL 873549, at *3; *J.N.*, 677 F. Supp. 2d at 322. Additionally, that DCI took steps to address Orlin's behavior is not evidence of the appropriateness of the IEP—the IDEA required DCI to take these steps anyway. *See* 34 C.F.R. § 300.324(a)(2)(i) ("The IEP Team must—. . . In the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior[.]"). Furthermore, the Court respects the opinions of DCI teachers who testified that Orlin progressed in his IEP goals after the implementation of the behavior programs. But such respect does not require this Court to endorse their conclusions about Orlin's academic progress. *Middleton*, 312 F. Supp. 3d at 140.

Therefore, the Hearing Officer did not err in determining that DCI failed to demonstrate that Orlin's April 25, 2019 IEP amendment was appropriate, and Lemus is entitled to summary judgment on this point.

### E. The Hearing Officer Erred in Awarding a Specific Amount of Tutoring Hours and Delegating to the IEP Team the Responsibility for Determining the Amount and Type of the Rest of the Compensatory Education

Finally, DCI challenges part of the relief ordered by the Hearing Officer. The Hearing Officer concluded that DCI had denied Orlin a FAPE from December 4, 2017, the date of his second IEP amendment, through February 6, 2020, when he was expelled from DCI. AR at 1682. However, the Hearing Officer further concluded that Lemus "offered no evidence of an appropriate type or amount of compensatory education services to which [Orlin] is entitled," AR at 1680, and therefore "any award by the Hearing Officer would be arbitrary." AR at 1681. In reaching this conclusion, the Hearing Officer correctly recognized that *Reid*, this Circuit's leading case governing the availability and calculation of compensatory awards in IDEA cases,

requires individualized compensatory awards. AR at 1680–81. The Hearing Officer further cited *B.D. v. Dist. of Columbia*, a more recent Circuit case addressing compensatory awards. AR at 1681. The Hearing Officer described the case as "strongly suggest[ing] that Hearing Officer Determinations that find a denial of FAPE must address compensatory education services" and that "assessments addressed at determining the nature and amount of service to address the appropriate compensation for a specific student could ameliorate the fact-specific requirement." AR at 1681 (citing *B.D.*, 817 F.3d at 799–800).

The Hearing Officer then went on to order DCI to: (1) fund 100 hours of independent tutoring services for Orlin in reading, mathematics, and written expression; (2) fund an independent evaluation to determine how much Orlin's academic skills could have reasonably been expected to grow during the relevant period with an appropriate IEP; and (3) convene an IEP team meeting within 30 days after receiving the evaluation to determine the appropriate amount of compensatory education services for Orlin.[16] AR at 1682. DCI challenges the first and third parts of the award as violative of *Reid*. Pl.'s MSJ at 32–33. The Court agrees.

Under *Reid*, courts and hearing officers may award "compensatory education" in the form of "educational services . . . to be provided prospectively to compensate for a past deficient program." *Reid*, 401 F.3d at 522 (internal citation omitted). A compensatory education "award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Id.* at 524. Calculation of a compensatory education award must "rely on individualized assessments," necessarily a fact-specific and flexible inquiry, rather than a "hour-for-hour replacement of time spent without FAPE." *Id.* Here, the Hearing Officer's award of 100 hours of independent

---

[16] The Hearing Officer's order used the team "Multidisciplinary Team." AR at 1682. This term is synonymous with "IEP Team." *See* 20 U.S.C. § 1414; *N.S. ex rel. Stein v. Dist. of Columbia*, 709 F. Supp. 2d 57, 60 (D.D.C. 2010).

tutoring, a form of compensatory education, was not supported by any individualized assessments or facts, as the Hearing Officer himself admitted. AR at 1681; *Platt v. Dist. of Columbia*, 168 F. Supp. 3d 253, 258 (D.D.C. 2016).

Additionally, a Hearing Officer "may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions." *Reid*, 401 F.3d at 526. Under the IDEA, hearing officers preside over due process hearings and have broad authority to award relief. *B.D.*, 817 F.3d at 798; 20 U.S.C. § 1415(i)(2)(C)(iii). However, IDEA due process hearings "may not be conducted by an employee of the State educational agency or the local educational agency involved in the education or care of the child." 20 U.S.C. § 1415(f)(3). Therefore, Orlin's IEP Team, which is partially made up of DCI employees, cannot exercise the Hearing Officer's power to determine appropriate compensatory education awards.

A hearing officer may reasonably rely on opinions, reports, or statements from such employees when making an independent determination of what is an appropriate compensatory education award—but the IDEA prohibits a hearing officer from delegating that determination. Accordingly, the Court will require the Hearing Officer to make such an independent determination on remand. Therefore, DCI is entitled to summary judgment on this point.

*       *       *

DCI has failed to prove to this Court that the Hearing Officer committed most of the errors alleged. Therefore, the Court must affirm the Hearing Officer's decision, except for the first and third parts of its relief order. *Reid*, 401 F.3d at 521; *Kerkam*, 862 F.2d at 887.

## V.    CONCLUSION

For the foregoing reasons, the Court will **DENY IN PART AND GRANT IN PART** DCI's motion for summary judgment and **GRANT IN PART AND DENY IN PART** Lemus's

motion for summary judgment. Accordingly, the Court will **VACATE IN PART** the Hearing Officer's determination and **REMAND** the case for further proceedings. A separate Order shall issue.

SIGNED this _____ day of March, 2023.

Royce C. Lamberth
United States District Judge